UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

ATOS SYNTEL INC., SYNTEL HOLDING
(MAURITIUS) LTD., and SYNTEL LLC,

                    Plaintiffs,

            - against -

IRONSHORE INDEMNITY INC.,

                    Defendant.

————————————————————

21-cv-1576 (JGK)

MEMORANDUM OPINION AND
ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs, Atos Syntel Inc., Syntel Holding

(Mauritius) Ltd., and Syntel LLC (collectively, "Syntel"),

brought this action against the defendant, Ironshore Indemnity

Inc. ("Ironshore"), for declaratory judgment and breach of

contract in connection with an insurance coverage dispute. The

defendant now moves to dismiss the complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6). For the following reasons, the

defendant's motion to dismiss is **denied**.

                         I.

The following facts are taken from the complaint and the

documents referenced and relied on in the complaint, and are

accepted as true for the purposes of this motion.

1

Syntel is a provider of information technology services. Compl. ¶ 12, ECF No. 1.[1] To cover the period of October 8, 2014, through October 8, 2015, Syntel purchased Errors & Omissions ("E&O") insurance in the amount of $25 million. Id. ¶ 13. Continental Casualty Company ("CNA") provided the first $10 million in coverage under a primary claims-made policy (the "CNA Policy"). Id. ¶ 14. As relevant here, the CNA Policy protected against "Technology and Professional Liability," including the costs of liability and defense arising from alleged "wrongful acts" committed while providing "Information Technology Services." Id. ¶ 15. "Information Technology Services" was defined to include, among other things, "designing, developing, programming, writing, testing, installing, servicing, supporting, maintaining, repairing and updating software, including any modification and reengineering and providing training, updates and support." Id.; Def.'s Mot. to Dismiss Ex. 2, at 14, ECF No. 25-3 ("CNA Contract"). With respect to such liability coverage, "wrongful act" was defined as "any actual or alleged act, error or omission" that was "committed solely in the conduct of Professional Services or Technology Services for others" or "resulting in the failure of the Insured's Technology

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

Products to perform the function or serve the purpose intended."
CNA Contract at 15.

In addition to the foregoing, the CNA Policy protected
against "Media Liability." Id. at 5. As to Media Liability only,
"wrongful act" included common law torts, including
"infringement of copyright or any . . . misappropriation of
ideas under implied contract or other misappropriation of
property rights, ideas or information." Id. at 15-16.

The CNA Policy also included several exclusions from
coverage, id. at 16-20, and provided that, in the event that
more than one coverage category applied, the "maximum total
retention amount applicable [would] be the highest of such
applicable [amounts]," id. at 22.

The next $10 million in coverage that Syntel purchased was
issued in Michigan by the defendant, Ironshore, under a first-
layer excess policy (the "Ironshore Policy"). Compl. ¶ 16. The
Ironshore Policy expressly provided that it would mirror the
terms (that is, "follow the form") of the CNA Policy with one
relevant exception: it included a "Non-Follow Form Endorsement"
providing that it would "not follow the form of [the] Media
Coverage [section]." Def.'s Mot. to Dismiss Ex. 1, at 8, ECF No.
25-2 ("Ironshore Contract"). Accordingly, Ironshore was not
"obligated to pay any loss arising from a wrongful act or
related wrongful acts as may be insured by reason of" that

section. Id. "Related wrongful acts" were defined, as per the underlying CNA Contract, as all wrongful acts "that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." CNA Contract at 13. "All other terms, conditions and exclusions remain[ed] unchanged." Ironshore Contract at 8.

On January 12, 2015, Syntel filed a lawsuit against The TriZetto Group ("TriZetto"). Compl. ¶ 20. In response, TriZetto asserted counterclaims against Syntel for misappropriation of trade secrets under New York law, misappropriation of trade secrets under the federal Defend Trade Secrets Act, and copyright infringement under federal law. Id. ¶¶ 21, 24; Compl. Ex. 2.[2] Syntel duly notified its insurance providers of the litigation. Compl. ¶¶ 26, 28.

In October 2020, CNA informed Syntel that its $10 million limit would soon be exhausted through payment of defense costs in the TriZetto lawsuit. Id. ¶ 30. In November 2020, that limit was reached. Id. Syntel then notified Ironshore and requested that it "commence paying Syntel's costs of defense and agree to pay any damages or settlement in the TriZetto [l]awsuit, up to the limits of Ironshore's policy." Id. ¶ 31. However, Ironshore

---

[2] TriZetto initially brought additional claims, but those claims had been dismissed by the time the case went to trial. Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Grp., Inc., No. 15-cv-211, ECF No. 215 (S.D.N.Y. May 18, 2021).

denied any obligation to provide coverage. Id. ¶ 32. Among other things, Ironshore contended that, because its policy did not include the provision for Media Liability, coverage was barred. Id. Syntel then filed this lawsuit against Ironshore on February 22, 2021. ECF No. 1. On May 18, 2021, final judgment against Syntel was entered in the TriZetto litigation. Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Grp., Inc., No. 15-cv-211, ECF No. 994 (S.D.N.Y. May 18, 2021).

Ironshore now moves to dismiss Syntel's claims on the grounds that the Ironshore Policy did not protect Syntel from TriZetto's claims, and therefore Syntel cannot plead an actionable claim for insurance coverage. ECF No. 25-9.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### III.

### A.

A threshold question is which state's law governs this motion. A court sitting in diversity must look to the choice of law rules of the forum state. Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). Under New York law, courts need not undertake a choice of law analysis unless there is a conflict between the applicable laws of the relevant jurisdictions, and in the absence of a conflict, a court may apply the substantive law of the forum. Id. An actual conflict of law exists if "the applicable law from each jurisdiction provides different substantive rules," Curley v. AMR Corp., 153

F.3d 5, 12 (2d Cir. 1998), and the differences "have a significant possible effect on the outcome of the trial." Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005). If the court finds a conflict, the New York choice of law analysis in a contract dispute focuses on the "center of gravity or grouping of contacts." Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co., 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011).

In this case, the defendant claims that Michigan law should apply because Ironshore issued the policy to the plaintiff in Michigan, and the parties allegedly "contemplated" that Michigan law would apply to any resulting dispute between the parties. The plaintiffs, for their part, argue that there is no conflict, and that New York law thus applies.

The plaintiffs are correct: there is no relevant conflict between Michigan and New York law with respect to the insurance coverage dispute at issue on this motion. Under New York law, an insurance contract is interpreted to "give effect to the intent of the parties as expressed in the clear language of the contract, . . . giv[ing] unambiguous provisions of an insurance contract their plain and ordinary meaning." Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 567 (2d Cir. 2011). "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning." Haber v. St. Paul

7

Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998); see also
Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 99 (2d Cir.
2012). So, too, under Michigan law. Courts applying Michigan law
"interpret an insurance contract similarly to any other
contract, . . . look[ing] to the plain language of the insurance
policy," Busch v. Holmes, 662 N.W.2d 64, 67 (Mich. Ct. App.
2003), and find an insurance contract ambiguous "when its
provisions are capable of conflicting interpretations." Klapp v.
United Ins. Grp. Agency, Inc., 663 N.W.2d 447, 453 (Mich. 2003).
And, notably, under the laws of both states, the meaning of an
ambiguous contract is generally a question of fact, see, e.g.,
id. at 453-54 (applying Michigan law); State v. Home Indem. Co.,
486 N.E.2d 827, 829 (N.Y. 1985) (applying New York law), thus
precluding dismissal on a motion for failure to state a claim.
As relevant here, the laws of the states are in accord. No
conflict of laws exists, and therefore New York State law should
be applied.

**B.**

Applying New York law, the allegations in Syntel's
complaint withstand Ironshore's motion to dismiss. Given the
ambiguities in the Ironshore Policy, its meaning cannot be
determined as a matter of law at the motion to dismiss stage.

"The determination of whether an insurance policy is
ambiguous is a matter of law for the court to decide." In re

8

Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998). Contract terms are ambiguous where they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Olin Corp., 704 F.3d at 99. On the other hand, where terms provide "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion," there is no ambiguity. Id.

In this case, Ironshore argues that it unambiguously disclaimed any duty to indemnify Syntel for claims of misappropriation of trade secrets and copyright infringement, and, therefore, Syntel fails to state a claim for insurance coverage. In particular, Ironshore argues that TriZetto's claims constitute wrongful acts falling within the Media Liability provision for which Ironshore has no obligation to pay. Moreover, because Technology and Professional Liability wrongful acts must be "committed solely in the conduct of Professional Services or Technology Services," Ironshore argues that TriZetto's claims also do not fall within the Technology and Professional Liability coverage. See CNA Contract at 15 (emphasis added). Therefore, Ironshore claims, it is not

required to indemnify Syntel, and Syntel fails to state a claim for insurance coverage.

At this stage, however, Ironshore's argument is unpersuasive. The contract language does not unambiguously support its claim that the Non-Follow Form Endorsement is an exclusion, whereby any claims that happen to fit within the scope of Media Liability are automatically excluded from coverage.[3] Syntel's alternative reading of the Non-Follow Form Endorsement as an exception—according to which it is not insured for claims that arise only out of Media Liability, but is insured for claims that fit within both the Media Coverage and another provision—is eminently reasonable. At the very least, the Court cannot decide as a matter of law that Ironshore's interpretation of the insurance contract is unambiguously correct.

Syntel's reasonable reading of the insurance contract precludes dismissal at this stage. The Non-Follow Form Endorsement is not explicitly worded as an exclusion; its language providing that the policy does "not follow" Media Liability coverage does not appear sufficiently strong to negate coverage. See Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) ("[T]o negate

---

[3] While Ironshore shuns the word "exclusion" in its reply brief, this is, in effect, the reading it wishes the Court to adopt.

coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon."). Moreover, the CNA Policy included explicit exclusions from coverage, see CNA Contract at 16-20, and Ironshore expressly adopted these, noting that, apart from its Non-Follow Form Endorsement, "all other terms, conditions and exclusions [of the CNA Policy] remain unchanged." Ironshore Contract at 8 (emphasis added). That Ironshore adopted this language but failed to describe the Non-Follow Form Endorsement as an exclusion implies that it was not intended as such. Cf. Gov't Employees Ins. Co. v. Saco, No. 12-cv-5633, 2015 WL 1527611, at *4 (E.D.N.Y. Mar. 31, 2015) ("[T]he use of different terms [in different contract provisions] implies that the terms are to be accorded different meanings.").

Because the Non-Follow Form Endorsement may not be an exclusion, it is at least ambiguous whether TriZetto's claims fall within the scope of the Technology and Professional Liability coverage, thus triggering Ironshore's duty to indemnify Syntel. The Ironshore Policy follows the CNA Policy with respect to Technology and Professional Liability. In relevant part, this provision includes the costs of defense and

11

liability arising from "any actual or alleged act, error or omission . . . committed solely in the conduct of Professional Services or Technology Services for others." CNA Policy at 14; Compl. ¶ 15. "New York courts have construed the language 'arising out of' broadly: '[i]n insurance contracts, the phrase arising out of is ordinarily understood to mean originating from, incident to, or having connection. It requires only that there be some causal relationship between the injury and the risk for which coverage is provided or excluded.'" Pa. Indem. Ins. Co. v. Streb, Inc., 487 F. Supp. 3d 174, 188 (S.D.N.Y. 2020) (quoting Nat. Organics, Inc. v. OneBeacon Am. Ins. Co., 959 N.Y.S.2d 204, 208 (App. Div. 2013)). Because Syntel is in the business of providing information technology services, it is, at the very least, ambiguous whether TriZetto's claims fall within the broad scope of "arising out of" with respect to Technology and Professional Liability.

Ironshore focuses on the CNA Policy's use of the word "solely," arguing that TriZetto's claims cannot trigger Technology and Professional Liability coverage because the underlying acts were not committed "solely" in the conduct of Professional or Technology Services.[4] But the use of the word

---

[4] To the extent that Ironshore raises a new argument focusing on the term "for others" in the policy—noting that the "very nature of copyright infringement and misappropriation of trade secrets is that the conduct is for the benefit of the actor, not 'for others,'" Def.'s Reply in Supp. of Mot. at 3—this argument fails. "This Circuit has made clear it disfavors new issues being

12

"solely" need not mean that the acts can trigger only one coverage provision. Instead, the word can reasonably be interpreted to mean that the "wrongful acts" that trigger Technology and Professional Liability must be performed <u>solely</u> in the course of providing technology and professional services— a fact that is not contested on the current motion. At the least, it is ambiguous whether this is so. See <u>Zurich Am. Ins. Co. v. Wausau Bus. Ins. Co.</u>, 206 F. Supp. 3d 818, 825 (S.D.N.Y. 2016).

Moreover, it is well-settled that a "contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect." <u>Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.</u>, 462 F. Supp. 3d 317, 322 (S.D.N.Y. 2020). However, interpreting "solely" to mean that acts could <u>only</u> be covered by the Technology and Professional Liability provision if they are covered <u>only</u> by that provision would render the overlapping

---

raised in reply papers." <u>Rowley v. City of New York</u>, No. 00-cv-1793, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) (collecting cases). In any event, a reasonable interpretation of acts in the performance of Professional Services or Technology Services "for others" could include acts, such as the ones here, that were committed while "designing, developing, programming, writing, testing, installing, servicing, supporting, maintaining, repairing and updating software, including any modification and reengineering and providing training, updates and support"—acts that, almost by definition, inhere to the benefit of others (namely, Syntel's clients). See CNA Contract at 14. Therefore, even though copyright infringement or misappropriation of trade secrets are the subject of civil liability, a reasonable interpretation of the contract is that this is irrelevant so long as the actions resulting in those violations were performed for the benefit of others.

coverage provision in the CNA Policy meaningless as to a key section in the contract. Read as a whole, there is no indication in either the CNA Policy or Ironshore's Non-Follow Form Endorsement that such a strict interpretation of the word "solely" was intended. See id. ("[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent.").

Ironshore finally argues that, even "if there were 'simultaneous' Wrongful Acts, Syntel's theory fails, because Syntel ignores the phrases 'arising from' and 'Related Wrongful Acts' in the Endorsement." Def.'s Reply in Supp. of Mot. at 4. However, because the Ironshore Policy does not explicitly exclude acts that fall within the Media Coverage provision, the fact that the acts underlying TriZetto's claims may also "arise from" "related wrongful acts" falling within the Media Liability coverage is of no moment. For the reasons described above, the "related wrongful acts" provision of the contract does not unambiguously preclude overlapping coverage. Acts can be both "related wrongful acts" triggering Media Coverage—for which Ironshore has no duty to indemnify—and wrongful acts committed solely in the conduct of Professional Services or Technology Services—which Ironshore does not even purport to exclude from its duty. This is a reasonable interpretation of the contract.

14

At best, the Ironshore Policy is ambiguous as to whether Syntel is entitled to indemnification for TriZetto's claims. Dismissal is thus precluded.

**IV.**

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit.

For the foregoing reasons, the defendant's motion to dismiss is **denied.** The Clerk is directed to close Docket Nos. 25 and 30.

**SO ORDERED.**

Dated:     **New York, New York**
           **October 6, 2021**

                                    _____
                                        John G. Koeltl
                                    **United States District Judge**