**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**ATOS SYNTEL INC., ET AL.,**

                         **Plaintiff,**            **21-cv-1576 (JGK)**

          **- against -**                 **MEMORANDUM OPINION AND**
                                          **ORDER**
**IRONSHORE INDEMNITY INC.,**

                         **Defendant.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

     The plaintiffs, Atos Syntel Inc., Syntel Holding
(Mauritius) Ltd., and Syntel LLC (collectively, "Syntel"),
brought this action against the defendant, Ironshore Indemnity
Inc. ("Ironshore"), for declaratory judgment and breach of
contract in connection with an insurance coverage dispute. The
defendant now moves for summary judgment pursuant to Federal
Rule of Civil Procedure 56, contending that it owes no liability
to Syntel under a $10 million Errors & Omissions ("E&O") policy.
For the following reasons, the defendant's motion for summary
judgment is **granted.**

                              **I.**

     The following facts are undisputed unless otherwise noted.

                              **A.**

     Syntel, a technology and professional services provider,
purchased a $25 million E&O insurance "tower" for the period
between October 8, 2014, through October 8, 2015 (the "2014-15

                               1

Policy Period"). Def's 56.1, ECF No. 59, ¶ 1; Plfs' 56.1, ECF No. 73, ¶¶ 16, 64. Syntel purchased this insurance tower through Marsh USA, Inc. ("Marsh"), Syntel's insurance broker from at least June 2014 through approximately June 2019. Dowd Dec., ECF No. 80, ¶ 5-6.

### 1.

Continental Casualty Co. ("CNA") provided the first $10 million in coverage under a primary claims-made policy numbered 268042821 (the "CNA Policy").[1] Def's 56.1, ¶ 2; Standish Aff., Exh. B, ECF No. 64-2, at 2-3. In relevant part, the CNA Policy protected against "Technology and Professional Liability," including the costs of liability and defense arising from "Wrongful Acts" committed while providing "Professional Services or Technology Services for others." Def's 56.1, ¶¶ 4-6. "Technology Services" was defined as "information technology services including, but not limited to: designing, developing, programming, writing, testing, installing, servicing, supporting, maintaining, repairing and updating software, including any modification and reengineering and providing training, updates and support." Id. ¶ 5. For purposes of

---

[1] "An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 535 n.3 (1978).

Technology and Professional Liability, "Wrongful Act" was defined as "any actual or alleged act, error, or omission" that was "committed solely in the conduct of Professional Services or Technology Services for others." Def's 56.1, ¶ 6.

In addition, the CNA Policy protected against "Media Liability." Id. ¶ 4. As to Media Liability only, "Wrongful Act" included "gathering, acquiring, obtaining, researching, developing, editing, preparing, producing, filming, videotaping and recording Matter" that results in "infringement of copyright," "misappropriation of ideas under implied contract or other misappropriation of property rights, ideas or information," "unfair competition," or "unfair trade practices." Id. ¶ 7. "Matter" meant "any content regardless of its nature or form." Standish Aff., Exh. 2, at 11.

The CNA Policy also supplied several exclusions from coverage. See Def's 56.1, ¶ 10. Exclusion Q, titled "Unfair Competition/Antitrust Claims/RICO Claims," barred coverage for any claim "based upon or arising out of any actual or alleged" actions involving "unfair competition, dilution, deceptive trade practices, civil actions for consumer fraud or false or deceptive advertising or misrepresentation in advertising . . . ." Id.

Syntel purchased the next $10 million in coverage for the 2014-15 Policy Period from Ironshore, which issued the first-layer excess policy numbered 001807001 (the "Ironshore Policy").[2] Def's 56.1, ¶ 1-2. The Ironshore Policy expressly provided that it would mirror the terms (that is, "follow the form") of the CNA Policy, with one relevant exception. Id. ¶¶ 2-3, 8. A "Non-Follow Form Endorsement" included in the Ironshore Policy provided that it would "not follow the form of [the] Media Coverage [section]." Id. ¶ 8. Accordingly, Ironshore was not "obligated to pay any loss arising from a wrongful act or related wrongful acts as may be insured by reason of" the Media coverage section. Id. The underlying CNA Policy defined "Related Wrongful Acts" as "all Wrongful Acts that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." Id. ¶ 9.

**2.**

The CNA and Ironshore policies also included notice provisions. The Ironshore Policy provided that "[a]s a condition precedent to their rights under this policy, the Insureds" (Syntel) "shall give to the Insurer" (Ironshore) "as soon as

---

[2] Zurich-American Insurance Company ("Zurich") added a further $5 million in coverage as the second-layer excess insurer. See Def's 56.1, ¶ 16; see also First Amended Compl. ("FAC"), ECF No. 50, ¶ 17.

practicable written notice in accordance with the terms, conditions, definitions, exclusions, and limitations of the" CNA Policy. Standish Aff, Exh. A, at 5; Def's 56.1, ¶ 11.

In turn, the CNA Policy provided the following:

> The Insured, as a condition precedent to the obligations of the Insurer[,] shall give written notice of any Claim . . . to the Insurer as soon as reasonably practicable after any Executive Officer learns of such Claim . . . but in no event later than ninety (90) days after termination or expiration of the Policy Period or any subsequent renewal Policy Period in an uninterrupted series of renewals, or prior to the expiration of the Extended Reporting Period.

Def's 56.1, ¶ 12.

Endorsement No. 11, an addendum to the CNA Policy titled "Revision to Notice Requirements," amended the Policy "for Claims Made Coverages" to add the following:

> Failure to give any notice required to be given by this Policy within the time prescribed herein shall not invalidate coverage of any claim, unless the failure to provide timely notice has prejudiced [the insurer] or unless the notice is provided after the expiration of the policy period, any renewal policy period and any extended reporting period. However, failure to give any notice required to be given by this Policy within the time prescribed therein shall not invalidate any claim made by the insured or by any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

5

Standish Aff., Exh. B at 44; Def's 56.1, ¶ 13.

**3.**

On July 31, 2015, Ironshore sent a non-renewal notice to both Syntel and Marsh. Def's 56.1, ¶ 29. Pursuant to that notice, the Ironshore Policy expired on October 8, 2015, and was not renewed. Id. ¶ 30. Syntel was aware of and communicated with Marsh about Ironshore's decision not to renew Syntel's 2014-15 policy. Id. ¶ 31. Another insurer replaced Ironshore as the first-layer excess carrier in Syntel's E&O insurance tower for the 2015-16 policy period. Id.

**B.**

In 2015, Syntel became embroiled in a legal dispute requiring E&O insurance coverage. On January 12, 2015, Syntel brought a lawsuit against the Trizetto Group, Inc. and Cognizant Technology Solutions Corporation (collectively, "TriZetto"), alleging claims arising out of a Master Services Agreement ("MSA") between Syntel and Trizetto (the "Underlying Lawsuit"). Plf's 56.1, ¶ 17. On February 23, 2015, TriZetto answered Syntel's complaint and asserted counterclaims for breach of the MSA, breach of the implied covenant of good faith and fair dealing, misappropriation of confidential information, unfair competition, tortious interference, and stealing trade secrets. Id. ¶¶ 18, 19, 21.

On March 4, 2015, Syntel amended its complaint in the Underlying Lawsuit. Id. ¶ 22. On September 30, 2016, TriZetto answered the amended complaint and asserted amended counterclaims. Id. ¶ 23. The amended counterclaims added a count for copyright infringement and divided the trade-secrets claim into two separate counts: one under federal law and the other under state law. Id. ¶ 24.

On January 30, 2017, the magistrate judge in the Underlying Lawsuit ordered a neutral-party forensic examination of Syntel's electronic devices to determine, in part, whether Syntel had copied, deleted, or destroyed documents from TriZetto's secure internal depository. Id. ¶ 37. On July 29, 2017, the forensic examiner submitted his report finding that Syntel had copied 2,000 files, consisting of 594 unique files, from TriZetto's depository. Id. ¶ 38.

Based on that forensic report, the magistrate judge issued a Preclusion Order on August 25, 2017. Id. ¶ 39. The Preclusion Order precluded Syntel from: (1) "offering or presenting any evidence that it did not misappropriate and unlawfully copy" two of TriZetto's trade secrets and (2) "offering or presenting any evidence that it independently developed any of the Platform Management Tools at issue in th[e] case." Id. On March 13, 2018,

the court overruled Syntel's objections to the magistrate judge's Preclusion Order. Id. ¶ 40.

In October 2020, TriZetto proceeded to trial on only three counterclaims: state trade-secret misappropriation, federal trade-secret misappropriation, and copyright infringement. Id. ¶ 25-27. At the end of the trial, "[t]he jury returned a verdict for TriZetto on all counts." Syntel Sterling Best Shores Mauritius Limited v. The Trizetto Group, Inc., 68 F.4th 792, 799 (2d Cir. 2023), cert. denied, 144 S. Ct. 352 (2023).[3]

### C.

On October 5, 2016, Marsh communicated with Syntel about providing formal notice of the Underlying Lawsuit to its insurers. Plf's 56.1, ¶ 69. On November 4, 2016, Syntel, through Marsh, provided written direct notice of TriZetto's original counterclaims to the insurers in its 2016-17 coverage tower (the "2016-17 Policy Notice"), which included CNA but not Ironshore. See Def's 56.1, ¶ 32.

Reserving its rights and defenses, CNA agreed to defend the counterclaims in the Underlying Lawsuit on behalf of Syntel. Plf's 56.1, ¶ 71. Continuing to reserve all rights and defenses under the CNA Policy, CNA then defended Syntel against

---

[3] A more detailed account of the Underlying Lawsuit is set forth in Syntel Sterling, 68 F.4th at 796-99.

TriZetto's counterclaims until the CNA Policy was exhausted. Id. ¶ 73. On or around November 16, 2020, CNA was in receipt of invoices from Syntel's counsel in the Underlying Lawsuit that exceeded the remaining limits of the CNA Policy. Def's 56.1, ¶ 28.

Unlike CNA, Ironshore did not receive the 2016-17 Policy Notice. See id. ¶ 32. On May 3, 2019, for the first time, Syntel, through Marsh, provided direct notice of the Underlying Lawsuit to Ironshore by a telephone call, followed up by email correspondence the same day (the "Ironshore Notice"). Id. ¶ 45. The plaintiffs dispute that this was the first time Ironshore had actual notice of the Underlying Lawsuit, calling the Underlying Lawsuit "publicly available news" as of October 5, 2016. Plf's 56.1, ¶ 45. However, the plaintiffs do not dispute that Syntel failed to provide direct notice of the Underlying Lawsuit to Ironshore before May 3, 2019. See id.; see also id. ¶¶ 48, 49, 52; Dowd Dec., ¶ 19.

Ironshore acknowledged receipt of the Ironshore Notice on the next business day, May 6, 2019. Def's 56.1, ¶ 51. On May 16, 2019, Ironshore issued a letter to Syntel denying coverage for the Underlying Lawsuit on three grounds: (1) late notice, (2) the Non-Follow-Form Endorsement on Media Liability, and (3) the

exclusion of unfair-competition claims under Exclusion Q. Id. ¶ 53.

### D.

Syntel filed this action on February 22, 2021. Compl., ECF No. 1. Ironshore moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on June 11, 2021. ECF No. 25. The Court denied Ironshore's motion to dismiss in an October 6, 2021 Memorandum Opinion and Order. Atos Syntel Inc. v. Ironshore Indem. Inc., No. 21-cv-1576, 2021 WL 4635920 (S.D.N.Y. Oct. 6, 2021).

Notably, at the motion-to-dismiss stage, the Court held that, "[a]t best, the Ironshore Policy is ambiguous as to whether Syntel is entitled to indemnification for TriZetto's claims," precluding dismissal. Id. at *5. In reaching this holding, the Court found that the Ironshore Policy's "language does not unambiguously support its claim that the Non-Follow Form Endorsement is an exclusion, whereby any claims that happen to fit within the scope of Media Liability are automatically excluded from coverage." Id. at *4. "Because the Non-Follow Form Endorsement may not be an exclusion," the Court considered it to be "at least ambiguous whether TriZetto's claims fall within the scope of the Technology and Professional Liability coverage, thus triggering Ironshore's duty to indemnify Syntel." Id.

10

Syntel later amended its complaint, by consent and with leave, on May 31, 2022. ECF No. 50. Ironshore answered the amended complaint on June 14, 2022. ECF No. 51. After discovery, Ironshore now moves for summary judgment on liability under the Ironshore Policy. See ECF No. 62. Ironshore contends that it is entitled to summary judgment dismissing the claims against it based on the late notice it received from Syntel. ECF No. 61 at 10-14. Ironshore also contends that the Ironshore Policy does not cover Syntel's claims in any event. Id. 15-22. Syntel opposes, arguing that a genuine dispute exists on whether its late notice caused prejudice to Ironshore, ECF No. 81 at 20-22, and that the Ironshore Policy does cover its claims, id. at 9-20.

## II.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in

short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party bears the initial burden of "informing the district court of the basis of its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

**III.**

**A.**

A threshold question is which state's law governs this motion. A court sitting in diversity must look to the choice of law rules of the forum state. Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). Under New York law, courts need not undertake a choice of law analysis unless there is a conflict between the applicable laws of the relevant jurisdictions, and in the absence of a conflict, a court may apply the substantive law of the forum. Id. An actual conflict of law exists if "the applicable law from each jurisdiction provides different substantive rules," Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998), and the differences "have a significant possible effect on the outcome of the trial." Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005).

In this case, the parties' briefs agree that Michigan substantive law governs the issues presented here under the Ironshore Policy, including its notice provisions. See Def's Mem., ECF No. 61, at 11 n.3; Plf's Opp., ECF No. 81, at 20 n.4; Def's Rep., ECF No. 83, at 1. Given the parties' agreement, the Court applies Michigan law for all purposes in interpreting the Ironshore Policy. See Arch Ins. Co. v. Precision Stone, Inc.,

584 F.3d 33, 39 (2d Cir. 2009) (finding that the state's substantive law assumed in the parties' briefs is "implied consent" and "sufficient to establish the applicable choice of law").

Under Michigan law, "[t]he construction and interpretation of the language in an insurance contract is a question of law." Citizens Ins. Co. v. Pro-Seal Serv. Grp., 730 N.W.2d 682, 685 (Mich. 2007). A contractual term is "ambiguous" if it is "equally susceptible to more than a single meaning." Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich., 892 N.W.2d 794, 798 (Mich. 2017).

### B.

Applying Michigan law, Ironshore is not liable to Syntel under the Ironshore Policy. There is no genuine dispute that Syntel failed to provide timely notice of its insurance claims to Ironshore. And under the Ironshore Policy, timely notice is a condition precedent to Ironshore's liability.

### 1.

Michigan law provides that "an unambiguous notice-of-claim provision setting forth a specified time within which notice must be provided is enforceable without a showing that the failure to comply with the provision prejudiced the insurer." DeFrain v. State Farm Mut. Auto. Ins. Co., 817 N.W.2d 504, 506

14

(Mich. 2012). This rule is consistent with the Michigan-law axiom that "an unambiguous contractual provision" must "be enforced as written unless the provision would violate law or public policy." Rory v. Cont'l Ins. Co., 703 N.W.2d 23, 31 (Mich. 2005). However, when a notice-of-claim provision uses temporally imprecise terms, the insurer "must establish actual prejudice to its position" to cut off liability. Koski v. Allstate Ins. Co., 572 N.W.2d 636, 639 (Mich. 1998).

In DeFrain, the court held that a contractual provision that required notice "within 30 days" was unambiguous. 817 N.W.2d at 514. The DeFrain court then enforced the policy's notice-of-claim provision without requiring the insurer to show prejudice from a late notice. Id. In Koski, by contrast, the court held that a provision "requiring notice immediately or within a reasonable time" was ambiguous. See 572 N.W.2d at 639. Accordingly, the Koski court required the insurer to show prejudice before allowing the insurer to enforce the notice provision in that case. Id. at 639-40.

Although both DeFrain and Koski concerned automobile insurance policies, Michigan courts have applied this notice-provision ambiguity rule uniformly across various types of insurance policies. See, e.g., Walker v. Aleritas Cap. Corp., No. 326354, 2016 WL 3749410, at *5 (Mich. Ct. App. Jul. 12,

15

2016) (affirming the trial court's grant of summary judgment to the insurer where the insured failed to serve notice as required under the unambiguous notice provision in a claims-made E&O policy) (unpublished op.). Applying the rule to this case, the notice requirement in the Ironshore Policy must be enforced if it is unambiguous, regardless of whether Syntel's late notice prejudiced Ironshore. <u>DeFrain</u>, 817 N.W.2d at 514.

The notice provision in this case is unambiguous. The Ironshore Policy required Syntel, "[a]s a condition precedent to their rights under th[e] policy," to give to Ironshore "as soon as practicable written notice in accordance" with the terms and conditions of the followed CNA Policy. Def's 56.1, ¶ 11. In relevant part, the CNA Policy required Syntel, "as a condition precedent" to coverage, to "give written notice of any Claim" to the insurer "as soon as reasonably practicable . . . <u>but in no event later than ninety (90) days after termination or expiration of the Policy Period</u>." Def's 56.1, ¶ 12 (emphasis added). Finally, Endorsement No. 11 to the CNA Policy added that failure to give timely notice "shall not invalidate coverage of any claim, unless the failure" prejudices the insurer "or unless the notice is provided after the expiration of the policy period . . . ." Def's 56.1, ¶ 13.

16

The notice requirement in the Ironshore Policy "could not be clearer." See DeFrain, 817 N.W.2d at 514. The Ironshore Policy required Syntel to provide notice of any covered claim to Ironshore no later than ninety days after termination of the policy period. Def's 56.1, ¶¶ 11-13. If Syntel failed to submit such timely notice to Ironshore, then Ironshore's liability under the Ironshore Policy would be terminated, whether Ironshore was prejudiced by the late notice, or not. DeFrain, 817 N.W.2d at 514 (stating that Michigan law does not "impose a prejudice requirement on contractual provisions requiring notice within a specified time").

The parties agree that the Ironshore Policy expired on October 8, 2015 and was not renewed. Def's 56.1, ¶ 30. Therefore, the deadline for Syntel to provide notice of the Underlying Lawsuit to Ironshore was ninety days after October 8, 2015: January 6, 2016. See id. ¶¶ 11-13, 30. It is also undisputed that Syntel failed to provide notice of the Underlying Lawsuit to Ironshore until May 3, 2019, over three years after the deadline had passed. Id. ¶ 45; Plf's 56.1, ¶ 45; Dowd Dec., ¶ 19. Accordingly, pursuant to the unambiguous terms of the Ironshore Policy, Ironshore's liability respecting the Underlying Lawsuit terminated when the clock reached midnight on January 6, 2016. DeFrain, 817 N.W.2d at 514.

Endorsement No. 11 to the CNA Policy does not preclude summary judgment. No reasonable jury could find that Syntel satisfied the provision in this case. Although Endorsement No. 11 requires prejudice to the insurer if timely notice is not given, that exception does not apply if "the notice is provided after the expiration of the Policy Period." Def's 56.1, ¶ 13. And in this case, the parties do not dispute that Syntel provided notice "after the expiration of the Policy Period." <u>See id.</u> ¶ 13; <u>see also id.</u> ¶ 45; Plf's 56.1, ¶ 45; Dowd Dec., ¶ 19.

Endorsement No. 11 also forgives late notice when the insured shows that: (1) it was "not . . . reasonably possible to give [timely] notice within the prescribed time," and (2) "notice was given as soon as was reasonably possible thereafter." Def's 56.1, ¶ 13.[4] But Syntel points to no impediment that prevented it from giving timely notice of the Underlying Lawsuit to Ironshore. And in any event, giving notice

---

[4] Endorsement No. 11 is required under Michigan law. MCL 500.3008 requires liability insurance policies to provide that the failure to comply with a notice provision "shall not invalidate any claim made by the insured if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible."

In <u>DeFrain</u>, the Michigan Supreme Court found it plain that the insured failed to give notice as soon as reasonably possible. 817 N.W.2d at 513. This provision thus did not bar the dismissal of the insured's claim against the insurer. <u>Id.</u> The <u>DeFrain</u> court did not suggest that this statute in any way undermined its holding that strict time limits for notice were to be enforced as written. <u>Id.</u> ("We also reject plaintiff's assertion that enforcing the 30-day notice provision would violate MCL 500.3008.").

on May 3, 2019—more than three years after the deadline—did not satisfy the second condition requiring Syntel to give notice "as soon as was reasonably possible" after the prescribed time. Syntel issued the 2016–17 Policy Notice to CNA and Zurich (among others) on November 4, 2016, which shows beyond dispute that it was "reasonably possible" to give Ironshore the same notice at that time. Therefore, Syntel's "delay is unreasonable as a matter of law." Title One, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 08–11624, 2009 WL 3059144, at *4 (E.D. Mich. Sept. 24, 2009) ("By no stretch of the imagination can [the insured]'s 41-month delay in reporting the lawsuit be deemed 'as soon as practicable.'").

In response, Syntel contends that the Ironshore Policy's notice-of-claim provision used temporally imprecise terms, meaning that under Koski, Ironshore must establish actual prejudice to enforce the provision. Plf's Opp., at 20–22. Syntel further argues that Ironshore cannot establish prejudice at the summary-judgment stage because a reasonable jury could find that Ironshore suffered no prejudice from Syntel's late notice.

Syntel's arguments are without merit. Syntel misreads the unambiguous text of the Ironshore Policy and the followed CNA Policy. Syntel points out correctly that the Ironshore Policy (and the followed CNA Policy) used temporally imprecise terms

19

like "as soon as reasonably practicable" and "reasonably possible." Def's 56.1, ¶¶ 12-13. But context matters. And read in context, the Ironshore Policy used temporally imprecise terms to supply the date when notice was to be given during the policy period or during any renewal or extension period. Id. But simultaneously, the Ironshore Policy set a hard ninety-day cutoff to provide notice after the policy terminated or expired. Id.

The Ironshore Policy expired on October 8, 2015, with Syntel's actual knowledge and consent. Def's 56.1 ¶ 30-31. Because Syntel failed to provide notice during the policy period, the unambiguous hard cutoff is the provision at issue in this case. Certain Underwriters at Lloyd's v. Glob. Team, USA, LLC, No. 20-cv-10180, 2022 WL 1734938, at *5 (E.D. Mich. Mar. 16, 2022) (finding that the policy "contain[ed] a definite notice period" when it required the insured to provide notice "as soon as practical, but in any event no later than 60 days after the end of the policy period"). Therefore, DeFrain supplies the operative rule, not Koski. Id. And under DeFrain, this Court must enforce the unambiguous notice provision in the parties' insurance contract. 817 N.W.2d at 514.

In short, Syntel failed to comply with the notice-of-claim provision in the Ironshore Policy. Therefore, Ironshore's

liability with respect to the Underlying Lawsuit terminated when the unambiguous ninety-day cutoff period expired.

**2.**

What has been said thus far requires that Ironshore's motion for summary judgment be granted under the plain terms of the Ironshore Policy. For purposes of completeness, however, Ironshore is also entitled to summary judgment if Ironshore were required to show prejudice from the lack of timely notice.

Syntel's late notice indisputably prejudiced Ironshore. Under Michigan law, "[a]n insurer suffers prejudice when the insured's delay in providing notice materially impairs the insurer's ability to contest its liability to the insured or the liability of the insured to a third party." Tenneco Inc. v. Amerisure Mut. Ins. Co., 761 N.W.2d 846, 859 (Mich. Ct. App. 2008). In this case, it is undisputed that the delay impaired Ironshore's ability to contest Syntel's liability to a third party: TriZetto.

By the time Syntel gave Ironshore notice, the Preclusion Order in the Underlying Lawsuit prevented Syntel from disputing that it misappropriated at least two of TriZetto's trade secrets. Def's 56.1 ¶ 39. The order also prevented Syntel from raising an independent-development defense. Id.; see also Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974)

21

("[T]rade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention"). The Preclusion Order therefore inflicted actual prejudice on Ironshore. Cf. Koski, 572 N.W.2d at 639-40 (finding actual prejudice when the insurer received notice three months after a default judgment had been entered against the insured).

In addition to the Preclusion Order, which is legally sufficient on its own to establish prejudice, see id., Ironshore also lost any opportunity to participate in any settlement or attorney-selection discussions for over four years. See Standish Aff., Exh. B, at 8; see also AMI Ent. Network, Inc. v. Zurich Am. Ins. Co., 526 Fed. Appx. 635, 637-68 (6th Cir. 2013) (applying Michigan law and finding actual prejudice where the insurer, for sixteen months, was deprived "of the opportunity to manage the litigation efficiently" and to approve rates for outside counsel).

Relying on Massachusetts law and one academic article, Syntel argues that the typical purpose of notice-of-claim provisions is rate-setting. Syntel then argues that Ironshore was not prejudiced because it is unclear whether its late notice affected Ironshore's rate-setting.

Syntel's argument concedes that rate-setting is not the only purpose behind notice-of-claim provisions. And under

Michigan law, one key purpose behind such provisions is to relieve insurers of the "sentry duty" of tracking "if or when the insured may be served with process." Koski, 572 N.W.2d at 640; see also City of Harrisburg v. Int'l Surplus Lines Inc. Co., 596 F. Supp. 954, 961 (M.D. Pa. 1984) (finding that the failure to "give notice within the contractually required time period" under a claims-made policy means "there is simply no coverage under the policy"). Thus, under Michigan law, Syntel's late notice caused actual prejudice to Ironshore as a matter of law, and no reasonable jury could find otherwise.[5]

## IV.

Because Syntel provided untimely notice to Ironshore, the defendant is entitled to summary judgment on all claims. Therefore, the Court need not reach Ironshore's additional arguments for dismissal.

---

[5] It is disputed whether and when Ironshore had actual knowledge of the Underlying Lawsuit. See Plf's 56.1 ¶¶ 45, 49, 51. However, Syntel does not argue that summary judgment should be denied because Ironshore had actual knowledge of the Underlying Lawsuit.

Whether Ironshore had actual knowledge or not, Ironshore's duty to defend was never triggered because it never received a formal notice under the Ironshore Policy. See Lloyd's, 2022 WL 1734938, at *5 (finding that the lack of notice foreclosed coverage); City of Harrisburg, 596 F. Supp. at 959-60 ("Without some action by an insured, . . . the insurer would have no way of knowing that a claim for coverage was being made under its policy."). And under Koski, Ironshore had no "sentry duty" to "track[] back and forth to the court house to keep a check on if or when [Syntel] may be served with process." See Koski, 572 N.W.2d at 640. Given the undisputed lack of timely notice in this case, the Preclusion Order certainly prejudiced Ironshore in any event.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion for summary judgment is **granted**.

Ironshore should submit a proposed judgment dismissing this action within five (5) days of the date of this Memorandum Opinion and Order. Syntel may submit any counterproposal and any objections two (2) days thereafter.

The Clerk is respectfully directed to close all pending motions.

**SO ORDERED.**

Dated:      New York, New York
            September 17, 2024

                                    _____
                                    John G. Koeltl
                                    United States District Judge

24